## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

KYLEE MCLAUGHLIN,            )
)
       Plaintiff,          )
)
vs.                         )     Case No.: CIV-21-0539-HE
)
THE BOARD OF REGENTS OF THE   )
UNIVERSITY OF OKLAHOMA,     )
a constitutional state agency,      )
LINDSEY GRAY-WALTON,       )
in her official and individual capacities, )
and KYLE WALTON, in his       )
official and individual capacities,    )
)
)
       Defendants.        )

---

### AMENDED COMPLAINT

---

Plaintiff Kylee McLaughlin ("Plaintiff" or "Kylee") for her causes of action against Defendants, the Board of Regents at the University of Oklahoma ("O.U."), Lindsey Gray-Walton ("Gray-Walton" or "Walton"), and Kyle Walton ("Kyle"), alleges and states:

### <u>INTRODUCTION</u>

1. This is an action brought by Plaintiff against Defendants, Gray-Walton and Kyle, Plaintiff's intercollegiate volleyball coaches at O.U., in their individual capacities for violating her constitutional rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983 and 1988. She also brings an action against these two individually named Defendants and O.U. in their official capacities

for violating her statutory rights provided by 70 O.S. § 2120 and against these two individually named Defendants for casting her in a false light, intentionally inflicting on her emotional distress, and interfering with her economic advantage. Although the individually named Defendants are husband and wife and O.U. employees, state colleges and universities are not enclaves immune from the sweep of the First Amendment. *Healy v. James*, 408 U.S. 169, 180 (1972). Employees of public institutions, like these Defendants, cannot investigate or discipline students for speech protected by the First Amendment. See *Speech First, Inc. v. Schlissel*, 939 F. 3d 756, 765-766 (6th Cir. 2019). But that is exactly what these Defendants did to Plaintiff. These Defendants, and each of them, also denied Plaintiff the protection afforded her by 70 O.S. § 2120 as a student at O.U.

## JURISDICTION AND VENUE

2. This action arises under First and Fourteenth Amendments of the United States Constitution; and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988; Plaintiff seeks damages against Defendants, Gray-Walton and Kyle, acting in their individual capacities for violation of her free speech and due process rights and their common law torts, and Plaintiff further seeks damages against Defendant O.U. and Defendants Gray-Walton and Kyle in their official capacities pursuant to 70 O.S. § 2120.

3. This Court has original jurisdiction over the federal claims under 28 U.S.C. §§ 1331 & 1343 and the pendent state claims under 28 U.S.C. § 1367(a).

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because all parties reside in this District and under 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiffs' claims occurred within this District.

## THE PARTIES

5. At all times relevant to this Complaint, Plaintiff was a scholarship student athlete and member of OU's women's intercollegiate volleyball team and resided in Norman, Oklahoma while pursuing her bachelor's degree and competing on the OU women's varsity volleyball team.

6. At all times relevant to this Complaint, Defendant Gray-Walton was and now is OU's Head Women's Volleyball Coach and resides in Norman, Oklahoma.

7. At all times relevant to this Complaint, Defendant Kyle was and now is an OU Women's Volleyball Assistant Coach, the husband of Defendant Gray-Walton, and resides in Norman, Oklahoma.

8. At all times relevant to this Complaint, the Defendants, Gray-Walton and Kyle, acted as Plaintiff's volleyball coaches and are sued in their individual capacities under 42 U.S.C. § 1983 and in their official capacities under 70 O.S. § 2120.  And at all times relevant to the Complaint, these Defendants, Gray-Walton and Kyle, acted under color of state law and were state actors.

## FACT ALLEGATIONS

9. Plaintiff is a twenty-two (22) year old white female and currently a student at the University of Oklahoma ("O.U.").

10. While in high school, Plaintiff excelled as a volleyball player and was named the Female Gatorade Volleyball Player of the Year for the State of Texas.

11. As a result of her athletic and academic accomplishments while in high school, Plaintiff was recruited by a number of universities with women's intercollegiate volleyball teams.

12. Plaintiff selected Oregon State University as her university of choice and spent her freshman year, 2017-2018, at that academic institution on a full athletic scholarship.

13. Plaintiff excelled at Oregon State University and was named the Pac 12 Freshman Volleyball Player of the Year for the conference and had a 4.0 grade point average.

14. Because Corvallis, Oregon, the home of Oregon State University, is several thousand miles from Plaintiff's home in Texas, the distance imposed a financial hardship and burden on Plaintiff's family and Plaintiff made the decision to transfer to a university closer to her home in the Dallas metroplex area.

15. Defendant Lindsey Gray-Walton ("Gray-Walton" or "Walton") was and still is the coach of OU's Women's Volleyball team and she recruited Plaintiff in the spring of 2018 to become a student/ athlete at O.U.

16. O.U. is a constitutional agency of the state of Oklahoma and a place where tolerance and the free exchange of divergent ideas purportedly allows discourse without fear of retaliation and bullying by its employees and students.  Its governing board has adopted a policy to comply with 70 O.S. § 2120 and professes to be committed to providing an environment conducive to the free, spirited, and safe exchange of ideas.

4

17. In its non-discrimination policy, O.U. states that it does not discriminate or permit discrimination by any member of the community against any individual based on the individual's race, color, religion, political beliefs, national origin, age, sex, sexual orientation, genetic information, genetic identity, gender expression, disability or veteran status in matters of admissions, employment, financial aid, housing, services in educational programs or activities, or health care services that the University operates or provides.

18. O.U.'s free speech and academic freedom policy ensures that members of the University community enjoy significant free speech protection guaranteed by the First Amendment of the United States Constitution and are free from retaliation.

19. In addition to its educational mission, O.U. provides opportunities for intercollegiate athletic competition that includes a women's volleyball team.

20. O.U. employs coaches to recruit and coach women volleyball players who are competitive athletically and academically with other institutions of higher education that have intercollegiate volleyball teams.

21. As employees of O.U., Defendants are charged with knowledge of the University's policies and procedures that, inter alia, prohibit discrimination on the basis of race and religion and proscribes all forms of bullying.

22. After transferring from Oregon State University, Plaintiff competed at O.U. and immediately started on its women's volleyball team.

23. During her first year at O.U., as a sophomore, Plaintiff was first team all-Big 12, Co-Setter of the year, was selected as the national player of the week, and received multiple

other honors in addition to continuing to excel in the classroom and being selected for the all-academic Big 12 team as well as being selected as O.U. Student – Athlete of the year.

24. During Plaintiff's junior year at O.U., she once again earned all-Big 12 first team honors and was selected for the Big 12's all-academic team.

25. Plaintiff was recognized for her leadership skills and was selected as a captain of the women's varsity volleyball team for the first two years while in the program.

26. Plaintiff is a Christian and political conservative although she did not wear either her religion or politics on her shirt sleeves. However, it was known to her teammates that she was in fact a practicing Christian and conservative in her political beliefs. Plaintiff was even pressed by O.U.'s Diversity, Equity and Inclusion ("DEI") to find a person on campus with different political views and "have a conversation" as homework.

27. Plaintiff's roommates while at O.U. have been a blend of African Americans, Asian, and Caucasian women, and these roommates were selected by Plaintiff.

28. As a result of the COVID 19 pandemic during academic year 2019-2020, resort to zoom and other tele-distancing became prominent for Plaintiff and the other O.U. student athletes.

29. During the past few years, this nation has been engaged in public discourse regarding social justice, racism, homophobia, and xenophobia. Colleges and universities have been part of this discourse and have created centers to deal with these issues. At O.U. it is called DEI.

30. During the COVID 19 Pandemic in 2020, the schedule for the O.U. women's volleyball team changed dramatically in that the Defendants, for several months, emphasized discussions about white privilege and social justice rather than coaching volleyball. All members of the O.U. team were required to participate in these discussions and watch a Documentary called "13th" on racism and slavery.

31. On June 11, 2020, Plaintiff was asked by Defendant Kyle to give her opinion on the video which she did by stating: "that she agreed 100% that slavery was wrong and the slaves were mistreated; and, that statistics showed that. Plaintiff also expressed her opinion toward the end of the video that it was slanted "left" and that it took some shots at what President Trump said and compared it with beatings of Blacks from the 1960's. Plaintiff responded with appropriate non-racists comments that represented her opinions.

32. Pressed for more input Plaintiff offered comments directly from the movie that Black incarceration was higher than other racial groups while representing a smaller overall percentage of the population. She stated that they were incarcerated mostly for marijuana and drugs.

33. Plaintiff did as Defendant Kyle instructed and on June 11, 2020, she and other teammates met in a small pod to discuss this video and to play games.

34. After the video conference, Sanaa' Dotson posted a tweet from account, @the_female_lead, in support of Black Lives Matter. She copied a tweet "screenshot" duplicating what the Plaintiff stated from the movie 13 and added: "things a racist person says" to it. She basically was calling the Plaintiff a racist. Defendant Gray-

Walton was asked if the player would be held accountable for her social media posts. This was called to Defendant Gray-Walton's attention, she said it would be addressed, but was dismissed quickly.

35. In June, 2020, the Head Football Coach at the University of Texas made public the desire to cancel the University of Texas fight song because it purportedly had racial undertones and change the name of numerous building as they deemed them to be racist.

36. On June 12, 2020, Plaintiff posted two emoji's, one of a skull and crossbones and one of a laughing clown on ESPN about the University of Texas wanting to get rid of its fight song called the "Eyes of Texas".

37. Plaintiff was well-aware of the intense rivalry between O.U. and the University of Texas in athletics and had competed against the University of Texas Women's Volleyball team on a number of occasions when she posted the emojis.  Plaintiff's opinion and belief was that the "Eyes of Texas" is not a racist song and she was expressing her belief that it would be inappropriate to get rid of it at the University of Texas because it is a strong tradition.

38. At 10:30 p.m. on June 12, 2020, Defendant Gray-Walton texted Plaintiff about the emojis stating that she needed to talk to Plaintiff.  Plaintiff was attending a graduation party and could not talk.   Defendant Walton set up a call early the next morning. During the phone call, Walton stated, "I can't save you when you get into the real world- when you leave here".

39. Because of Plaintiff's posting regarding the University of Texas fight song, Plaintiff received several comments within the thread from the University of Texas women's volleyball program as well as O.U. women teammates rebuking the Plaintiff's position.

40. On June 13, 2020, Defendant Gray-Walton had a 1 ½ hour phone call with Plaintiff in which Defendant Gray-Walton ordered Plaintiff to take down her posts, which Plaintiff did as directed, and asked Plaintiff why she posted it to which Plaintiff responded that it was crazy that the University of Texas would want to change a 100-year tradition. Defendant Gray-Walton laboriously went into O.U. guidelines about posting negative things about teammates online although Plaintiff posted nothing about either O.U. or the University of Texas volleyball players or any particular group.

41. Defendant Gray-Walton further stated in that June 13, 2020 phone call to Plaintiff that although it was Plaintiff's First Amendment right to post, she should not post things like her questioning the abolition of the University of Texas fight song and spent approximately thirty minutes talking about Plaintiff's white allergies and white privilege and that Plaintiff needed to look into herself to identify these things.

42. On June 15, 2020, Defendant Gray-Walton sent a group text about discussing Black Lives Matter with a picture of George Floyd.  This text stated, *inter alia*, "we can disagree and still love each other unless your disagreement is rooted in my oppression and denial of my humanity and right to exist."

43. On June 15, 2020, Defendants Walton, Kyle, and assistant coach Jake Barreau, and the Psychological Research Organization ("PRO") representative, Delores Christensen, and a DEI member representative and all incoming seniors on the volleyball team met

9

regarding Plaintiff's statements set out in paragraph 31 and 32, and during this meeting Plaintiff's character was attacked and she was called a racist and homophobe. Plaintiff was continuously attacked by players and coaches that is Defendant Walton said, "We can't save you when you get into the real world, when you leave here". Defendant Kyle said, "Not sure I can coach you anymore". Teammate Keyton Kinley said, "you shouldn't like a post without asking us first". Keyton Kinley further commented on Sanaa' Dotson social media post referencing Kylee as a racist – "if the shoe fits". Plaintiff attempted to apologize to the zoom meeting group if it had offended them; however, apologies were not accepted by the group because it was not said with enough "feeling".

44. As a result of the pressure Defendants exercised on Plaintiff, on June 16, 2020, Plaintiff called the University of Texas women's volleyball coach and several of the University of Texas volleyball players to apologize, if she had offended any of them, and to appease Defendants as well as Plaintiff's desire not to have her actions misconstrued as being racist or homophobic. University of Texas players accepted her apology on the phone call.

45. These events accusing Plaintiff of being racist and homophobic caused Plaintiff to experience great emotional distress, sleeplessness, and anxiety that greatly concerned Plaintiff's parents, and Plaintiff's mother attempted to discuss the situation with Defendant Gray-Walton who refused to accept her mother's calls or texts. Plaintiff's mother attempted to call O.U.'s PRO's, left a voicemail message and did not receive a return call.

46. Although Plaintiff supports equality, social justice, and finds racism despicable, she disagreed with the WOKE culture and critical race theory advocated and practiced by two of her coaches who are the Defendants in this action.

47. As a consequence of this political discourse, accusing a person in the O.U. community of being a racist or homophobe clearly blemishes that person's good name and reputation.

48. On June 26, 2020, there was a zoom meeting with Defendant Gray-Walton and O.U.'s compliance officer Toby Baldwin ("Baldwin") and Greg Tipton, ("Tipton") the Administrator of the sport of volleyball. Defendant Walton said this was just a meeting to catch up and there was no previous knowledge of the attendance of Baldwin or Tipton for this meeting.

49. Ten minutes before the June 26, 2020, zoom meeting, Plaintiff was told that neither of her parents needed to be there at the meeting because Plaintiff was 21 years old.

50. Defendant Baldwin in his position of Compliance was told by Plaintiff's mother Tina McLaughlin that Plaintiff had not heard from the PRO's representative (Dr. Delores Christensen), who was responsible for the mental health of the volleyball players, regarding any support for her mental health. Baldwin agreed and said this was not acceptable and would be addressed. Plaintiff never heard from Dr. Christensen.

51. Defendant Gray-Walton and Baldwin were asked why other teammates were not held responsible for political comments or social media posts that Plaintiff has record of and it was stated that it will be addressed but there have been no suspensions or reprimands.

52. Defendant Gray-Walton censored Plaintiff because of her alleged conduct detrimental to the team atmosphere.  She pointed out that numerous players have posted videos of other players drinking alcohol in the volleyball locker room and that it is common knowledge of a player caught cheating in class on a final exam, by the professor without reprimand.  And it is well documented that one of Plaintiff's teammates has written racial comments without any apparent sanctions being imposed.

53. During the zoom meeting, Plaintiff was told that she did not fit the culture of the program and they could not trust her based on comments she had made (according to teammates) in the past and her social media posts, and she was given an ultimatum by Defendants with three options for her senior season as follows:

    A.  She could keep her scholarship, red shirt, and practice only with the coach and not the team, and would continue to receive the PRO's assistance and diversity, equity and inclusion (DEI) training;

    B.  She could keep her scholarship and just be a student; or

    C.  She could transfer with only two weeks left before Volleyball started for fall semester.

54. Defendant Gray-Walton and Baldwin wanted Plaintiff to give them her decision by the following Monday and were pressing her mostly on the transfer option.

55. As a result of that meeting, Plaintiff became extremely upset and emotional and cried for three days, could not sleep, and refused to eat.  Thankfully she was at home instead of at school where Plaintiff had no support system in place.  Unfortunately, as recent as late April 2021, when Plaintiff's parent went to Norman for graduation pictures.

Plaintiff was asked by Plaintiff's parent why she was so sad and responded in tears "the people I thought were my friends have abandoned me".

56. At the June 29, 2020 follow-up zoom meeting attended by Plaintiff's parents and Defendants Gray-Walton and Baldwin, Plaintiff's parents told Defendants Gray-Walton and Baldwin, that Plaintiff needed more time to process her options, and on July 3, 2020, Plaintiff made the decision to keep her scholarship, red shirt, practice with the coach, and not the team, and continue to receive the psychological research team PRO's and DEI training.

57. There was a discussion about how the team would be informed of the decision on her ultimatum option – Plaintiff wanted Defendant Walton to tell the team in the Zoom meeting.  On July 6, 2020, there was a team meeting about Plaintiff's decision and Plaintiff and the rest of the team were told by an emotional Defendant Gray-Walton, who had been "cold" in all previous calls with Plaintiff and her parents.  This matter was to stay in-house and to not to talk to friends or family about it and only speak to the coaches.

58. Within a few days of the team meeting, one of Plaintiff's teammates, Sarah Maras, told the O.U. varsity baseball team, of which Plaintiff's boyfriend was a member, that Plaintiff had been kicked off the volleyball team for being racist.  Plaintiff informed Defendant Walton; however, there were no repercussions for Sarah Maras.

59. On August 20, 2020, Plaintiff was required to participate in the freshman athlete orientation, the only O.U. Senior athlete in the meeting, by zoom for two days although

no other upper-class member of the volleyball team was required to participate.  The volleyball team had an in-person orientation strictly for volleyball players.

60. On August 22, 2020, teammate Olivia Curtis came to Paige Johnson's residence and advised Paige Johnson that Keyton Kinley, one of Plaintiff's teammates, said they would not talk or associate with Paige Johnson or they will lose playing time because she was friends with Plaintiff who Defendants have called out as a racist.

61. On August 26, 2020, Plaintiff started working out on her own because Defendant Gray-Walton failed to contact Plaintiff regarding the one-on-one practices.  There were no contacts made to Plaintiff by the PRO's or anyone associated with the volleyball program to check on her well-being from the initial Seniors meeting where Plaintiff was bullied, harassed and discriminated against.

62. On August 26, 2020, and because of the harassment and discrimination, Plaintiff entered the NCAA transfer portal and was contacted by UCLA's first assistant women's volleyball coach who asked Plaintiff if her red shirt status had anything to do with politics.

63. The UCLA assistant coach was an assistant to Defendant Gray-Walton during Plaintiff's sophomore year at O.U., was a friend of Defendant Gray-Walton, and told Plaintiff on August 28, 2020, they wouldn't know if anything (scholarship) was available at UCLA for at least three months.  Subsequently, three days later, on August 31, 2020, she called Plaintiff and said they no longer had anything available for her, and that ended Plaintiff's ability to consider UCLA as a transfer school.

64. On September 1, 2020, Defendant Gray-Walton who despised President Trump expressed her displeasure by posting on social media, that stated "Not all Trump supporters are racist but all of them decided that racism isn't a deal breaker." This appeared on Defendant Gray-Walton's social media timeline as the lead representative of O.U. volleyball.

65. On September 2, 2020, Defendant Walton lied to Plaintiff when she told Plaintiff she could not practice with her because she was trying to contact trace and determine if she was actually a contact COVID positive and canceled Plaintiff's scheduled practice.

66. However, a social media post for O.U. volleyball shows Defendant Gray-Walton in her practice with the rest of the team that same day, September 2, 2020. She was coaching in the gym with volleyball team members.

67. Although Plaintiff was to be treated as any other redshirt (other than one-on-one practices with Defendant Gray-Walton) she was excluded from volleyball team pictures on September 8, 2020, and she did not receive any team gear, i.e., shirts, shoes, sweats, etc., that all red shirts receive, and was not invited into the locker room, team meetings or any events related to volleyball.

68. On September 15, 2020, there was a two-hour meeting with the DEI official and the volleyball coaches in which Defendant Gray-Walton asked for six players to be selected (3 upper class (Junior/Senior) and 3 lower class (Freshman/Sophomore)) to be the "insiders" on problems with players' boyfriends, drinking, grades, or family and to get it on pen and paper and not by text and discuss with Defendant Gray-Walton only.

69. At that September 15, 2020 meeting, Defendant Gray-Walton stated: "it is not about volleyball anymore -- it needs to start with us." During this meeting, Defendant Gray-Walton discussed the entire team kneeling for the National Anthem and told players that they should stand up in the meeting and explain why they think they should stand for the National Anthem. Numerous players stated that they did not want to kneel for the National Anthem and there was pressure being exerted to force players to kneel.

70. Plaintiff tested positive for the Corona Virus on September 15, 2020, and received a call from the physician stating that either a coach, DEI officer, or a PRO representative would be checking on Plaintiff while in quarantine - off campus and in a hotel where she was not able to leave.

71. Plaintiff was in quarantine for ten days without anyone from O.U. checking on her although Defendant Gray-Walton contacted one of the Plaintiff's roommates to make sure that the roommate was "doing okay" living with Plaintiff and her other "conservative" roommate. Thereafter, Defendant Walton and several of the Volleyball Coaching staff assisted Plaintiff's roommates Kira Morikawa (Volleyball) and Hannah Lee (Golf) move out of the shared apartment while Plaintiff was in class. There was no advance notification of the move.

72. On September 28, 2020, Plaintiff had her first practice with Defendant Gray-Walton although she received no contact from the PRO representative to check on her.

73. On October 6, 2020, Plaintiff received an email from O.U.'s DEI office about training and requiring her to be in an individual "Growth Plan". This plan involved a series of online training about homosexuality, unlearning "classism", "ableism", "trans and

homosexual negativities", and "sexism".  In addition, Plaintiff was forced to take courses on diversity and identities, communication, intra-culture communications, active listening, and identity of privilege and race.  Plaintiff spent in excessive ten hours in completing this required "growth plan" training which included pop-quizzes and tests.  This plan was designed to condition Plaintiff to be WOKE.

74. None of Plaintiff's teammates received an individual Growth Plan and Defendant Gray-Walton explained by saying that the rest of the girls are involved in team programming. Plaintiff's parents called Brett Sumler to confirm all players were doing the same training as Plaintiff but was forwarded to Defendant Lindsey.  Plaintiff's parent received no confirmation.

75. On October 13, 2020, Plaintiff received an email regarding player tickets for women's varsity volleyball games that dropped her from four tickets, which were available in their first game vs. Texas to Plaintiff in which family attended, to only one ticket for family and friends although Defendant Gray-Walton had represented to Plaintiff that she would be treated just like any other red shirt other than having individual practices with her only.  Plaintiff, at this time, was given an email regarding her "opting out" of the volleyball program.

76. Although O.U.'s PRO representatives were responsible for the mental health concerns of the women on the volleyball team, Plaintiff did not receive emails, texts, or calls from the PRO representatives who failed and refused to intervene when Plaintiff was called a homophobe and racist, accused of making racists comments, and was attacked by teammates who assailed her character.

77. Plaintiff has not made any homophobic statements or comments and accepted the gay lifestyle of Jake Barreau, one of Plaintiff's assistant coaches.

78. At all times while Plaintiff has been a student athlete at O.U. she has obeyed the team rules, excelled academically, demonstrated great leadership, and competed at a very high level which was acknowledged by third parties.

79. With knowledge of the actions taken against Plaintiff as set forth hereinabove, Defendants and O.U. officials have ignored their own published anti-discrimination policies that, *inter alia*, prohibit discrimination based on political beliefs and religion and allowed Plaintiff to be victimized by Defendants' discrimination and harassment.

80. Plaintiff is informed and believes and based on such information and belief further alleges that the Defendants, and each of them, are part of the social justice and critical race theory movement that deems white persons, such as Plaintiff, to be privileged and racist, and these Defendants actively discriminated against Plaintiff on the basis of her Caucasian race and their dislike of persons who are politically conservative and express their beliefs like Plaintiff did.

81. Defendants knew that accusing Plaintiff of being a racist and homophobic in the O.U. community blemished her good name and reputation especially since for several years this country has had a very public and contentious conversation about social justice.

82. At all times, Plaintiff's speech and expression was in accordance with O.U.'s written policies and was at no time unduly disruptive.

83. As a result of Defendants' actions as herein alleged, Plaintiff was forced to enter the transfer portal and transfer to the University of Mississippi although she did not want

to leave after transferring one prior occasion from Oregon State University to O.U. and establishing herself as a highly successful student athlete.

84. Plaintiff's goals have been to play the sport of volleyball professionally, coach volleyball, and ultimately become an athletic administrator, and in pursuit of these goals, Plaintiff has worked hard to become a nationally recognized volleyball player and excellent student.

85. Defendants' actions in branding Plaintiff as a racist and homophobe have not only caused Plaintiff to transfer to the University of Mississippi to complete her eligibility and to pursue a Master's degree, they have also stigmatized Plaintiff in universities like O.U. where critical race theory, diversity, inclusion, and WOKE culture are institutionally wide spread.

86. Plaintiff's speech as herein alleged at no time materially and substantially interfered with O.U.'s appropriate discipline in the operation of the University.

## FIRST CAUSE OF ACTION AGAINST DEFENDANTS GRAY-WALTON AND KYLE IN THEIR INDIVIDUAL CAPACITIES FOR VIOLATION OF THE UNITED STATES CONSTITUTION'S FIRST AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983, SUPPRESSION OF FREE SPEECH

87. Plaintiff incorporates paragraphs 1-86 as those set forth in full herein.

88. Plaintiff is a political conservative, and Christian who expresses her Christian faith through word and deed.

89. Defendants' punishment of Plaintiff in 2020 was retaliatory against Plaintiff because of her engagement in First Amendment protected speech.

90. Defendants cannot identify any non-retaliatory reason for the actions described in paragraphs 9 through 86.

91. The actions of these Defendants have chilled and continue to chill Plaintiff's exercise of her right to engage in expressive First Amendment.

92. The actions of these Defendants described in paragraphs 9 through 86 would chill any student athlete of ordinary firmness from exercising their right to engage in expressive First Amendment activity.

93. Plaintiff's constitutional right to freedom of speech has been denied under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

94. Defendants and each of them violated Plaintiff's clearly established constitutional rights which any coach at OU should have known, rendering them personally liable to Plaintiff under 42 U.S.C. § 1983.

95. As a direct and approximate result and cause of Defendants' actions, Plaintiff has suffered economic loss, emotional distress, humiliation, embarrassment, injury to her reputation, and lost enjoyment of life. Plaintiff also seeks an award of punitive and exemplary damages against Defendants.

96. As a direct and approximate result of Defendants' actions as described above, Plaintiff was deprived of her constitutional rights. As a legal consequence of Defendants' violations of Plaintiff's First and Fourteenth Amendment rights, which are irreparable injuries per se, Plaintiff is entitled to the reasonable costs of suit, including reasonable attorneys' fees. Plaintiff is seeking monetary damages against Defendants in their individual capacities.

WHEREFORE, Plaintiff prays for judgment against Defendants Gray-Walton and Kyle, and each of them, as follows:

1. For monetary damages in accordance with 42 U.S.C. § 1983 and in an amount in excess of $75,000 and as determined by the jury to compensate Plaintiff for Defendants' unconstitutional interference with her rights under the First and Fourteenth Amendments to the United States Constitution.  Plaintiff has suffered emotional distress as a result of Defendants' actions.

2. An award of attorney's fees and costs under 42 U.S.C. § 1988; and,

3. All other legal and equitable relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION AGAINST DEFENDANTS GRAY-WALTON AND KYLE:  PENDENT STATE CLAIM FOR FALSE LIGHT INVASION OF PRIVACY

97. Plaintiff incorporates paragraphs 1 through 96 as though set forth in full herein

98. Each Defendant committed tortious acts against Plaintiff starting with the false and defamatory statements that Plaintiff is a racist and homophobe.

99. More specifically, Defendants each made wrongful and false statements about Plaintiff's response to questions about slavery, African American incarceration rates, and Plaintiff's actions in lampooning the attempt to abolish the eyes of Texas as the University of Texas fight song by accusing her of being a racist and homophobe.  These statements placed Plaintiff in a false light before the public and those with whom she lived, existed, and engaged as a varsity female volleyball athlete at O.U.

100.     The false light cast by these remarks was highly offensive to a reasonable person and to Plaintiff and invaded Plaintiff's privacy.

101.     Defendants knew or should have known their statements calling Plaintiff a racist and homophobe were false and would place Plaintiff in a false light thereby invading her privacy, particularly in a university community dominated by persons who consider themselves to be WOKE and promote issues that concern social and racial justice.

102.     Defendants know or should have known that statements calling Plaintiff a racist and homophobe would cause teammates, students, and others at O.U. to shun and avoid Plaintiff and cause her great humiliation, anxiety, and sleeplessness.

103.     Consequently, Defendant's conduct has injured Plaintiff's reputation and standing in the community, her reputation as a collegiate volleyball player, and caused her to transfer from the University of Oklahoma to another University in order to complete her intercollegiate volleyball career and pursue her aspirations to become a professional volleyball player.

104.     Plaintiff is entitled to all damages Defendants caused her, including but not limited to financial losses, injury to her standing and reputation in the community, her personal humiliation, mental anguish and suffering, and lost enjoyment of life, all to her damage in a sum in excess of $75,000.

105.     Defendant Plaintiff is also entitled to punitive and exemplary damages against Defendants for their intentional, willful, and malicious acts.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For actual damages in a sum in excess of Seventy-Five Thousand Dollars ($75,000.00) and as determined by the jury at the time of trial;

2. For punitive and exemplary damages as determined by the jury at the time of trial;

3. For interest thereon as provided by law;

4. For her costs; and

5. For such and further relief as the Court deems just and proper.

## THIRD CAUSE OF ACTION AGAINST DEFENDANTS GRAY-WALTON AND KYLE: PENDENT STATE CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

106. Plaintiff incorporates paragraphs 1 through 104 as though set forth in full herein.

107. The conduct of each name defendant was also extreme and outrageous in branding Plaintiff as a racist and homophobe.  Such conduct is not tolerated in a civilized society and this conduct caused Plaintiff emotional distress, and the resulting emotional distress was severe.

108. As a direct result of Defendant's intentional, willful, and malicious acts and conduct causing Plaintiff to experience severe emotional distress, Plaintiff has suffered great emotional distress, sleeplessness, anxiety, embarrassment, injury to her reputation as a collegiate volleyball player, and humiliation, all to her damage in a sum in excess $75,000.

109.   Plaintiff is also entitled to punitive and exclamatory damages against Defendants for their intentional, willful, and malicious acts.

WHEREFORE, Plaintiff prays for judgment against Defendants Gray-Walton and Kyle, and each of them, as follows:

1.  For actual damages in a sum in excess of Seventy-Five Thousand Dollars ($75,000.00) and as determined by the jury at the time of trial;

2.  For punitive and exemplary damages as determined by the jury at the time of trial;

3.  For interest thereon as provided by law;

4.  For her costs; and

5.  For such and further relief as the Court deems just and proper.

### FOURTH CAUSE OF ACTION AGAINST GRAY-WALTON AND KYLE: PENDENT STATE CLAIM FOR INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP AND PROSPECTIVE ECONOMIC ADVANTAGE

110. Plaintiff incorporates paragraphs 1 through 108 as though set forth in full herein.

111.  Plaintiff had a contractual relationship with O.U. as a scholarship student athlete that compensated Plaintiff for her service as an intercollegiate volleyball player by providing tuition, books, and a living allowance and allowed her to further develop and showcase her athletic skills as a volleyball player.

112.  Defendants, and each of them, interfered with Plaintiff's contractual relationship with O.U. and her prospective economic advantage by their actions as set forth in the Fact Allegations and incorporated by reference herein, that caused Plaintiff to transfer from O.U. where she intended to finish her athletic eligibility, obtain a

master's degree, and to position herself for a career in professional volleyball, coaching, and athletic administration.

113.   Defendants' interference with Plaintiff's contractual relationship and prospective economic advantage was intentional, willful, and malicious.

114.   As a direct and proximate result of Defendants' interference as aforesaid, Plaintiff has suffered economic loss, mental anguish and emotional distress, sleeplessness, anxiety, injury to reputation, and lost enjoyment of life all to her damage in a sum in excess of Seventy-Five Thousand Dollars ($75,000.00).

115. Plaintiff further seeks punitive and exemplary damages against Defendants, and each of them, as determined by the jury at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants, Gray-Walton and Kyle, and each of them, as follows:

1. For actual damages in a sum in excess of Seventy-Five Thousand Dollars ($75,000.00) and is determined by the jury at the time of trial;

2. For punitive and exemplary damages as determined by the jury at the time of trial;

3. For interest thereon as provided by law;

4. For her costs; and

5. For such and further relief as the Court deems just and proper.

**FIFTH CAUSE OF ACTION AGAINST O.U. AND DEFENDANTS GRAY-WALTON AND KYLE IN THEIR OFFICIAL CAPACITIES: PENDENT STATE CLAIM FOR VIOLATION OF 70 O.S. § 2120**

116. Plaintiff incorporates paragraphs 1 through 115 as though set forth in full herein.

117. Plaintiff is a person protected by 70 O.S. § 2120 and prosecutes this claim against O.U. and Defendants Gray-Walton and Kyle, in their official capacities, in accordance with the provisions of this statute.

118. At all relevant times herein mentioned, Defendants Gray-Walton and Kyle were O.U. employees and they are sued in their official capacities as persons responsible for the violations of Plaintiff's protected First Amendment rights as set forth herein.

119. Defendants Gray-Walton and Kyle at all times herein mentioned acted in their capacities as O.U. employees as did those other employees assigned by DEI and Compliance who violated Plaintiff's federal and state right of protected free speech and expression.

120. As a direct result of these Defendants' violations of Plaintiff's First Amendment Rights, Plaintiff has suffered economic loss, mental anguish and emotional distress, sleeplessness, anxiety, injury to reputation, and loss enjoyment of life, all to her damage in a sum in excess of Seventy-Five Thousand Dollars ($75,000.00).

121. Plaintiff further seeks a reasonable attorney's fee and court costs as provided by 70 O.S. § 2120.

122. Although 70 O.S. § 2120 does not require a notice of tort claim to a government defendant, Plaintiff filed a notice of tort claim in a timely manner.

WHEREFORE, Plaintiff prays for judgment against Defendants, O.U., Gray-Walton and Kyle, and each of them, as follows:

1. For money damages in an amount as determined by the jury at the time of trial for Plaintiff's economic loss, mental anguish and emotional distress, sleeplessness,

anxiety, injury to professional reputation, lost enjoyment of life, in a sum in excess

of Seventy-Five Thousand Dollars ($75,000.00) and as determined by the jury;

2. For interest thereon as provided by law;

3. For her court costs and a reasonable attorney's fee; and,

4. For such and further relief as the Court deems just and proper.

Respectfully submitted,

  /s/ Stanley M. Ward
Stanley M. Ward, OBA#9351
**WARD & GLASS, L.L.P.**
1601 36th Avenue, N.W.
Norman, Oklahoma   73072
(405) 360-9700 Telephone
(405) 360-7902 Facsimile
**Attorney for Plaintiff**

**JURY TRIAL DEMANDED**
**ATTORNEY LIEN CLAIMED**