# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KYLEE MCLAUGHLIN, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) Case No. CIV-21-0539-HE |
| THE BOARD OF REGENTS OF THE UNIVERSITY OF OKLAHOMA, a constitutional state agency, LINDSEY GRAY-WALTON, in her official and individual capacities, and KYLE WALTON, in his official and individual capacities, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## SPECIAL APPEARANCE AND MOTION DISMISS
## DEFENDANTS LINDSEY GRAY-WALTON AND KYLE WALTON

Michael Burrage, OBA No. 1350
J. Renley Dennis, OBA No. 33160
Austin R. Vance, OBA No. 33294
WHITTEN BURRAGE
512 N. Broadway Ave., Ste 300
Oklahoma City, OK  73102
Telephone: (405) 516-7800
Facsimile: (405) 516-7859
Email: mburrage@whittenburragelaw.com
         jdennis@whittenburragelaw.com
         avance@whittenburragelaw.com
*Attorneys for Defendants, Lindsey-Gray Walton and Kyle Walton*

Defendants Lindsey Gray-Walton ("Coach Walton") and Kyle Walton (collectively, "Defendants") respectfully submit this Motion to Dismiss and state:

## ALLEGATIONS

Taken in the best possible light,[1] Plaintiff's Complaint asserts the following allegations against Defendants:

1. **Plaintiff was asked to remove a post on ESPN's social media directed at the University of Texas.**

In June 2020, Plaintiff posted two emojis (a clown and skull and crossbones) on ESPN's Instagram under an article about the University of Texas's possibly changing its fight song, "Eyes of Texas." *Dkt.* 5 ¶ 36. Coach Walton texted Plaintiff to discuss her post, stating: "I can't save you when you get into the real world-when you leave." *Id.* The following day, Coach Walton had an hour and a half conversation with Plaintiff, where Coach Walton emphasized the University of Oklahoma (the "University") guidelines about negative posts. *Id.* ¶¶ 40-41. Coach Walton then informed Plaintiff "it was Plaintiff's First Amendment right to post," asked Plaintiff to consider her "white allergies" and "privilege," and asked Plaintiff to remove the post. *Id.* Plaintiff removed the post. *Id.*

2. **Several people labeled Plaintiff a racist and homophobic.**

The next day, Defendants met with the team seniors to discuss Plaintiff's post. *Id.* ¶ 43. During that meeting, Coach Walton again stated: "We can't save you when you get into

---

[1] "[O]n a motion to dismiss, the Court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the nonmoving party." *Leterski v. Kingfisher Cty. Jail*, No. CIV-06-451-W, 2007 WL 1039224, at *2 (W.D. Okla. Apr. 3, 2007) (citing *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir.2006)).

the real world, when you leave here," while Kyle Walton said: "Not sure I can coach you anymore." *Id.* Several people—none identified as Defendants—labeled Plaintiff racist and homophobic. *Id.* Due to her desire to not be construed as racist or homophobic, Plaintiff called the University of Texas volleyball coach and several players to apologize, which was accepted. *Id.* ¶ 44. But this was not the first time Plaintiff was labeled a racist.

Earlier that year, members of the volleyball team watched the documentary 13. *Id.* ¶ 30. Kyle Walton asked Plaintiff her opinion and instructed Plaintiff to discuss the documentary with teammates. *Id.* ¶ 33. Following that discussion, another teammate duplicated statements from Plaintiff and posted to twitter with the statement "things a racist person says." *Id.* ¶ 34. Coach Walton said it would be addressed, but it wasn't. *Id.*

### 3. Because Plaintiff was "detrimental to the team atmosphere" and lacked her teammates' trust, she was given alternative scholarship options.

On June 26, 2020, Coach Walton held a zoom call with the University's compliance officer Toby Baldwin and Greg Tipton as well as Plaintiff. *Id.* ¶ 48. Plaintiff was informed that because she was 21 years old her parents did not need to attend. *Id.* ¶ 49. Someone asked Coach Walton why no other volleyball players were being held responsible for their political or social media posts, to which Coach Walton stated it would be addressed. *Id.* ¶ 51. There were no subsequent suspensions or reprimands for those other players. *Id.*

Coach Walton told Plaintiff she was censored because her "conduct [was] detrimental to the team atmosphere." *Id.* ¶ 52. Plaintiff retorted that several other players (1) posted videos of them drinking in the locker room, (2) were caught cheating on tests, and (3) writing racial comments, all without sanction or reprimand. *Id.* Nonetheless,

2

Plaintiff was told that she did not fit into the culture of the team and that her teammates could not trust her based on comments she made in the past and her ESPN post. *Id.* ¶ 53. Coach Walton gave Plaintiff three (3) options:

1. Plaintiff could keep her scholarship, redshirt, and practice with the coach while she continued to receive PROs assistance and DEI training;

2. Plaintiff could keep her scholarship but not participate on the team; or,

3. Plaintiff could transfer to another school.

*Id.* ¶ 53. Coach Walton requested a decision from Plaintiff by the following Monday but encouraged Plaintiff to transfer. *Id.* ¶ 54. On July 3, 2020, Plaintiff decided to take the first option. *Id.* ¶ 56. At Plaintiff's request, an emotional Coach Walton informed the team. *Id.* A volleyball player told University baseball team members that Plaintiff was kicked off the team for being racist. *Id.* ¶ 58.

By August 26, 2020, Plaintiff began working out on her own because Coach Walton never contacted her about practice. *Id.* ¶ 61. On September 28, 2020, Coach Walton and Plaintiff conducted the first one-on-one practice. *Id.* ¶ 72. On October 6, 2020, the University's DEI Office contacted Plaintiff about her growth plan, which included online trainings on classism, ableism, trans and homosexual negatives, and sexism. *Id.* ¶ 73. Plaintiff was informed that the team would be completing similar programs. *Id.* ¶ 74.

On September 2, 2020, Coach Walton cancelled practice with Plaintiff because she was attempting to contact-trace a potential exposure to Covid-19; nonetheless, Plaintiff saw a volleyball team practice picture with Coach Walton present that same day. *Id.* ¶¶ 65-66. On September 15, 2020, Plaintiff tested positive for Covid-19 and quarantined for ten

3

(10) days. *Id.* ¶¶ 70-71. On August 22, 2020, (1) Paige Johnson told (2) Plaintiff that (3) Olivia Curtis heard from (4) Keyton Kinley that volleyball players would lose play time if they associated with Paige because she was friends with Plaintiff. *Id.* ¶ 60.

    **4.    Coach Walton is a "WOKE" liberal who supports "critical race theory," "Black Lives Matter," and despises President Trump.**

On June 14, 2020, Coach Walton sent a message to the team in support of Black Live Matter, with a picture of George Floyd, that read: "we can disagree and still love each other unless your disagreement is rooted in my oppression and denial of my humanity and right to exist." *Id.* ¶ 42. Coach Walton then posted "Not all Trump supporters are racist but all of them decided that racism isn't a deal breaker" on social media. *Id.* ¶ 64. On September 15, 2020, there was a two-hour meeting where Coach Walton selected six (6) players to report on issues affecting the team, such as relationships, drinking, grades, and family issues. *Id.* ¶ 68. During that meeting, Coach Walton led a discussion about kneeling and challenged players to defend why they stand for the National Anthem. *Id.* ¶ 69.

    **5.    Coach Walton was inconsiderate to Plaintiff on a few occasions.**

Coach Walton contacted someone she was rooming with to see if she was "doing okay," but Coach Walton did not contact Plaintiff. *Id.* ¶¶ 70-71. Coach Walton assisted two of Plaintiff's roommates in moving out without giving notice to Plaintiff. *Id.* ¶ 71. Coach Walton refused to accept calls from Plaintiff's mother. *Id.* ¶ 45.

    **6.    Plaintiff was denied privileges of other redshirt volleyball players.**

Plaintiff was required to participate in freshman orientation, while the rest of the team took part in volleyball orientation. *Id.* ¶ 59. Plaintiff was excluded from certain

privileges that other redshirts receive, such as team pictures, team gear, and not being invited to team meetings or other events. *Id.* ¶ 67. On October 13, 2020, Plaintiff received an email stating that she would receive one (1) ticket to the OU volleyball game against Texas instead of four (4), as was normal for redshirted players. *Id.* ¶ 75. She also received an email about her opting out of the volleyball program. *Id.*

## ARGUMENTS AND AUTHORITIES

**I.    Qualified immunity bars Plaintiff's Section 1983 Claim.**

"If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." *Lewis v. Tripp*, 604 F.3d 1221, 1230 (10th Cir. 2010).[2] It is undeniable that athletic coaches are such employees entitled to qualified immunity.[3] To that end, qualified immunity shields Defendants "so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (internal quotation omitted). Once qualified immunity is asserted, Plaintiff must show: "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016).[4] It is of vital importance to resolve

---

[2] Qualified immunity is "immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).

[3] *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 173 (3d Cir. 2017); *Davis v. Carter*, 555 F.3d 979, 980 (11th Cir. 2009); *Lowery v. Euverard*, 497 F.3d 584, 585 (6th Cir. 2007); *Kipps v. Caillier*, 197 F.3d 765, 766 (5th Cir. 1999); *Green v. Sandy*, No. 5:10-CV-367-JMH, 2011 WL 4688639, at *2 (E.D. Ky. Oct. 3, 2011).

[4] Because failing to meet either prong is fatal to Plaintiff's case, the Court can evaluate them in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Here, the allegations overcome neither prong of qualified immunity.[5]

### A.  Defendants did not violate Plaintiff's constitutional or statutory rights.

#### 1.  *Kyle Walton's actions did not violate Plaintiff's rights.*

Within the Complaint are two (2) allegations against Kyle Walton: (1) he asked Plaintiff to discuss the documentary 13, and (2) he stated he was unsure if he could coach Plaintiff. There is no allegation that Kyle Walton took action based on those statements nor an explanation as to how these statements violated Plaintiff's right. Plaintiff's "high level of generality" regarding her rights is insufficient to overcome qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Any other allegations Plaintiff retorts apply to Kyle Walton are conclusory at best.[6] Kyle Walton should be dismissed.

#### 2.  *Coach Walton did not retaliate against Plaintiff for her speech.*

To recover for a First Amendment retaliation claim, Plaintiff must show that: (1) she was "engaged in constitutionally protected activity," (2) Coach Walton injured Plaintiff so as to "chill a person of ordinary firmness from continuing to engage in that protected activity," and (3) Coach Walton was "substantially motivated" in response to Plaintiff's

---

[5] For the same reasons that Plaintiff's allegations fail the first prong of qualified immunity, they also fail to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Parker v. Ritter*, No. 08-CV-00737-MSK-KLM, 2010 WL 1286081, at *4 (D. Colo. Mar. 25, 2010).
[6] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted).

protected activity. *McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010); *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). Plaintiff failed to properly allege these elements.

### a. *Plaintiff fails to allege a constitutionally protected activity.*

"[S]tudent athletes are subject to more restrictions than the student body at large." *Lowery v. Euverard*, 497 F.3d 584, 589 (6th Cir. 2007) (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995)). By virtue of joining the team, student athletes "subject themselves to a degree of regulation even higher than that imposed on students generally." *Vernonia Sch. Dist. 47J*, 515 U.S. at 657; *Johnson v. Cache Cty. Sch. Dist.*, 323 F. Supp. 3d 1301, 1318 (D. Utah 2018).[7] "Somewhat like adults who choose to participate in a 'closely regulated industry,'" student athletes must "expect intrusions upon normal rights and privileges." *Id.* One such restriction is the freedom of speech:

> This greater degree of oversight is due to the differing natures of the classroom and playing field. One of the purposes of education is to train students to fulfill their role in a free society. Thus, it is appropriate for students to learn to express and evaluate competing viewpoints. The goal of an athletic team is much narrower. Of course, students may participate in extracurricular sports for any number of reasons: to develop discipline, to experience comradery and bonding with other students, for the sheer "love of the game," etc. Athletic programs may also produce long-term benefits by distilling positive character traits in the players. However, the immediate goal of an athletic team is to win the game, and the coach determines how best to obtain that goal.

---

[7] "[I]t is well-established that students do not have a general constitutional right to participate in extracurricular athletics.' *Lowery*, 497 F.3d at 588 (citing *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 180 F.3d 758, 763 (6th Cir.1999), *rev'd on other grounds*, 531 U.S. 288 (2001); *Alerding v. Ohio High School Athletic Ass'n.*, 779 F.2d 315 (6th Cir.1985); *Angstadt v. Midd–West Sch. Dist.*, 377 F.3d 338 (3d Cir.2004); *Niles v. University Interscholastic League*, 715 F.2d 1027 (5th Cir.1983))." *Green v. Sandy*, No. 5:10-CV-367-JMH, 2011 WL 4688639, at *5 (E.D. Ky. Oct. 3, 2011).

7

*Lowery*, 497 F.3d at 589. As it relates to on court conduct, for example, students are not at liberty to question the decisions of the coach via a First Amendment claim:

> The plays and strategies are seldom up for debate. Execution of the coach's will is paramount. Moreover, **the coach controls who plays and for how long**, placing a disincentive on any debate with the coach's ideas which might have taken place.

*Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1190 (6th Cir. 1995) (emphasis added).[8] Likewise, a player's speech that potentially disrupts, distracts from, or hurts "team unity," "sportsmanship," or the "cohesiveness of the team," is subject to a coach's remedial action. *Lowery*, 497 F.3d at 590 (quoting *Wildman*, 249 F.3d at 771).

Although Plaintiff conveniently omits her exact statements, the Complaint makes clear that her teammates believe she was racist and homophobic. *Dkt.* 5 ¶¶ 34, 43, 58.[9] While Plaintiff was free to make bigoted statements, she was not free from the consequences of how her teammates perceived those statements. The First Amendment cannot force her teammates to trust Plaintiff or desire to play with her. Consequently, the Complaint makes clear that Coach Walton was within her rights to cultivate a winning "team atmosphere" by ensuring the players that "trust" each other would be on the court. *Id.* ¶¶ 52-53. To that end, the Court must only determine if Coach Walton's "forecast of substantial disruption was reasonable." *Lowery*, 497 F.3d at 593. Based on the fact-intensive regaling of the Complaint, it is clear numerous players believed Plaintiff was

---

[8] An athlete's insubordinate language is not protected speech. *Wildman ex rel. Wildman v. Marshalltown Sch. Dist.*, 249 F.3d 768, 772 (8th Cir. 2001).
[9] Plaintiff did not quote statements of Defendants that branded her a racist or homophobe.

racist and homophobic, and it was thus reasonable for Coach Walton to believe that disrupted the cohesion of the team, which would undermine its ability to win.

### b. *Plaintiff fails to allege how Coach Walton injured her as to chill engagement in a protected activity.*

Plaintiff is required to show how Coach Walton's action was a "deterrent" to her speech. *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004). That action must objectively be sufficient to prevent a person of "ordinary firmness" from engaging in protected speech. *Id.* Here, there is no specific protected speech identified in the Complaint; instead, Plaintiff asserts that she is "a political conservative, and Christian who expresses her Christian faith through word and deed," but there is no allegation of how that was chilled. Dkt. 5 ¶88.

Undeniably, there is an allegation that Coach Walton requested Plaintiff take down her comment under ESPN's Instagram post, but there is no allegation of any threats or consequences that would result if Plaintiff failed to adhere. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *C.f. Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).[10] Moreover, the Complaint itself indicates Coach Walton affirmed "it was Plaintiff's First Amendment right to post," but encouraged her to consider her white privilege. Dkt. 5 ¶¶ 40-41. Her decision to remove the comment following that discussion is not a First Amendment violation:

---

[10] *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) ("This Court has recognized that a chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arise[s] from an objectively justified fear of real consequences.'").

9

> We agree with the dismissal of the First Amendment claims of Sherwin and Jane Seamons individually because the only conduct of the defendants that was directed at them individually were discussions (ultimately unsuccessful) to persuade them not to speak out publicly about the incident together with statements by the defendants pursuant to their own First Amendment rights that Sherwin and Jane Seamons perceived as hostile to them or their position. The essence of the First Amendment is to allow all parties the opportunity for attempts to persuade as well as the opportunity for robust, even hostile, exchanges of conflicting views.

*Seamons v. Snow*, 84 F.3d 1226, 1236–37 (10th Cir. 1996). Today—just like last year—nothing prevents Plaintiff from reposting her comment on ESPN's page. Her decision to remove the post and failure to make the comment again has always been her own.

### c. *Plaintiff fails to allege any fact showing that Coach Walton was motivated by Plaintiff's protected speech to retaliate.*

Plaintiff asserts Coach Walton is a liberal while Plaintiff is conservative; however, Plaintiff fails to allege any facts related to Coach Walton's motives for her conduct. Due to random references to "WOKE" culture and "critical race theory," it is unclear whether this Complaint was meant to assert a claim or simply garner the attention of the news. Regardless, without a factual allegation relating to Coach Walton's motive, Plaintiff must fail on the third prong as well.

### B. *There was no clearly established right at the time of Defendants' conduct.*

A clearly established right is one that is so clear that "every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11–12. For there to be a clearly established right, *"existing precedent must have placed the statutory or constitutional question beyond debate." Id.* Clearly established law cannot be

based on a "high level of generality," but must show that law was "undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* Undeniably, qualified immunity is a high bar for Plaintiff to pass, as it only fails those how are "plainly incompetent" or "knowingly violate the law." *Id.* Plaintiff's burden is not only to prove Defendants are mistaken Plaintiff's rights, but that they were clearly mistaken by on-point precedent when the conduct occurred. Clearly, based on the discussion *supra*, Defendants assert that is an impossible task—the burden to prove otherwise is on Plaintiff.

II. **Plaintiff fails to state a claim upon which relief can be granted.**

Under Federal Rule of Civil Procedure 12(b)(6), "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). For the "doors of discovery" to "unlock" beyond the pleading stage, Plaintiff must be "armed with more than conclusions." *Id.* at 679 (Any conclusion asserted within the Complaint is "not entitled to the assumption of truth."). To that end, a proper allegation is more than "a sheer possibility that a defendant has acted unlawfully." *Id.* The Complaint, instead, must lead the Court to the conclusion that relief is "plausible," an analysis that "requires the reviewing court to draw on its judicial experience and common sense." *Id.* Plaintiff clearly alludes to a conspiracy of "WOKE" "critical race" theorists targeting a Christian conservative minding her own business, but that "wide swath" concoction does not provide the particulars needed for a sustainable Complaint. *VanZandt v. Oklahoma Dep't of Human Servs.*, 276 Fed. Appx. 843, 846 (10th Cir. 2008).

11

### A.     *Defendants did not place Plaintiff in false light.*

To recover for false light invasion of privacy, Plaintiff must allege: (1) Coach Walton and Kyle Walton "gave publicity" to a matter that placed the Plaintiff "before the public in a false light," (2) "the false light in which the Plaintiff was placed would be highly offensive to a reasonable person," and (3) Coach Walton and Kyle Walton "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Tanique, Inc. v. State ex rel. Oklahoma Bureau of Narcotics and Dangerous Drugs*, 2004 OK CIV APP 73, ¶ 31 (citations omitted.). "[T]he right of action for false light invasion of privacy is a product of the same societal need as the tort of outrage or intentional infliction of emotional distress, which will lie only in the presence of extreme and outrageous conduct." *Bates v. Cast*, 2014 OK CIV APP 8, ¶ 18 (citation omitted). Plaintiff fails to allege the first and third element of false light.

First, there are no allegations supporting this claim against Kyle Walton, and nowhere is it alleged that Coach Walton gave publicity to anything involving Plaintiff. There is certainly a conclusory statement that Defendants "made wrongful and false statements" about Plaintiff, but that fails to provide a description of those statements. For example, there is no allegation that Coach Walton accused Plaintiff of being racist or homophobic, publicly or otherwise. More fatal, however, is that Oklahoma law defines publicity to be made to the "public at large." *Eddy v. Brown*, 1986 OK 3, 715 P.2d 74, 78. But any meetings with volleyball team members cannot constitute publicity as a "limited number" of attendees, by its nature, is not the public at large. *Id.*

Plaintiff is also required to allege that Defendants had "knowledge of or act[ed] in reckless disregard as to the falsity of the publicized matter." *Bates*, 2014 OK CIV APP 8, ¶ 18. The equivalent of "actual malice." *Id.* The Complaint fails to state anywhere Defendants were aware that Plaintiff was, in fact, not racist or homophobic; consequently, there is no allegation that they possessed "a high degree of awareness of probable falsity or in fact entertained serious doubts as to the truth of the publication." *Id.*

### B.   *Defendants did not intentionally cause Plaintiff emotional distress.*

A claim for intentional infliction of emotion distress requires Plaintiff to allege that: (1) Coach Walton and Kyle Walton "acted intentionally or recklessly," (2) Coach Walton's and Kyle Walton's "conduct was extreme and outrageous," (3) Plaintiff suffered emotional distress as a result; and (4) Plaintiff's emotional distress was "severe." *Computer Publications, Inc. v. Welton*, 2002 OK 50, ¶ 7. Under Oklahoma law, the court "must assume a gatekeeper role" to ensure only claims that meet "a threshold legal determination" for intentional infliction of emotional distress ("IIED") proceed. *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 856 (10th Cir. 2005). First, Plaintiff does not allege any conduct by Coach Walton or Kyle Walton that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citing *Kraszewski v. Baptist Med. Ctr. of Okla., Inc.*, 916 P.2d 241, 248 n. 25 (Okla.1996)).[11] Again, while the

---

[11] Plaintiff also fails to allege any fact "so severe that no reasonable [person] could be expected to endure it." *Id.* (citing *Computer Publ'n*, 49 P.3d at 736).

13

Complaint asserts Defendants branded Plaintiff a racist and homophobe, no facts support that conclusion. Aside from that, Plaintiff identifies no other conduct to support IIED.

### C. Defendants did not interfere with Plaintiff's contract or a prospective economic advantage.

"[I]nterference with a contractual relationship results in the loss of a property right." *Crouch v. Thompson*, No. 14-CV-00420-RAW, 2015 WL 5841814, at *1 (E.D. Okla. Oct. 7, 2015). "[P]articipation in athletic activity," however, is not a "property interest." *Colorado Seminary (Univ. of Denver) v. Nat'l Collegiate Athletic Ass'n*, 417 F. Supp. 885, 895 (D. Colo. 1976), *aff'd*, 570 F.2d 320 (10th Cir. 1978). Aside from that, Plaintiff does not allege that Coach Walton or Kyle Walton interfered with a property right; in fact, Plaintiff alleges she kept her scholarship and preserved her eligibility by redshirting.

Defendants cannot interfere with Plaintiff's contract because they were acting in a representative capacity to the party to the contract. *Voiles v. Santa Fe Mins., Inc.*, 1996 OK 13, 911 P.2d 1205, 1210. Wrongful interference with contract can arise only if "one who is not a party to a contract," but Defendants were "a party to the contract, in [their] representative capacity." *Voiles*, 1996 OK 13, 911 P.2d at 1210; *Batton v. Mashburn*, 107 F. Supp. 3d 1191, 1198 (W.D. Okla. 2015). It is not possible for them to interfere with the contract between their principal, the University, and the other party, Plaintiff. *Id*.

Finally, there is no prospective economic advantage in potential professional athletics or other future careers. Such interests are too speculative to meet the requirements for pleading. *ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC*, 407 F. Supp. 3d 1186, 1190 (W.D. Okla. 2019). But even as an economic interest, a collegiate athlete's possible

14

"future professional careers" is purely "speculative." *Colorado Seminary*, 417 F. Supp. at 895. An economic advantage requires more than "wishful thinking."[12]

### III. **Defendants are improperly named for Plaintiff's 70 O.S. § 2120 Claim.**

Oklahoma statute title 70 provides that any person aggrieved by a violation of section 2120 may bring an action against the "public institution of higher education and its employees acting in their official capacities." Nonetheless, Oklahoma Statute title 51, section 163(c) provides:

> **In no instance shall an employee of the state or political subdivision acting within the scope of his employment be named as defendant** with the exception that suits based on the conduct of resident physicians and interns shall be made against the individual consistent with the provisions of Title 12 of the Oklahoma Statutes.

(emphasis added).[13] Defendants should be dismissed as named parties in their official capacity to avoid confusion through the remainder of the proceedings.

### CONCLUSION

For the reasons set forth above, Defendants request that the Court dismiss all of Plaintiffs' claims against them and grant all relief deemed just and equitable.

---

[12] John Kimpflen and Karl Oakes, *Interference with prospective economic advantage; business expectancy*, 86 C.J.S. TORTS § 37 (June 2021) (citing *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 354 N.W.2d 341 (1984) *and Anderson v. Anderson*, 2003 MT 9N, 315 Mont. 536, 66 P.3d 322 (2003)).

[13] A claim brought against "an employee in his or her official capacity is viewed as imposing liability upon the governmental entity, and designating an employee in such capacity as a named defendant for this type of claim is improper." *Shaw v. City of Oklahoma City*, 2016 OK CIV APP 55, 380 P.3d 894, 897.

Respectfully submitted,

*s/ Michael Burrage*
Michael Burrage, OBA No. 1350
J. Renley Dennis, OBA No. 33160
Austin R. Vance, OBA No. 33294
WHITTEN BURRAGE
512 N. Broadway Ave., Ste 300
Oklahoma City, OK  73102
Telephone: (405) 516-7800
Facsimile: (405) 516-7859
Email: mburrage@whittenburragelaw.com
            jdennis@whittenburragelaw.com
            avance@whittenburragelaw.com
*Attorneys for Defendants, Lindsey-Gray Walton and Kyle Walton*

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF Registrants:

Stanley M. Ward
Ward & Glass, LLP
1601 36th Avenue, N.W.
Norman, Oklahoma 73072

*s/ Michael Burrage*